WICKER, Judge.
This appeal arises from a medical malpractice suit. Vivian Long, widow of Joseph Byron Long, filed suit both individually and on behalf of the Estate of Joseph Byron Long, for the death of her husband against several defendants. A non-jury trial lasting six days proceeded against Drs. E. Ward Sudderth, Michael D. Friley, Robert G. Font, and their insurer, St. Paul Fire and Marine Insurance Company. The trial court rendered judgment in favor of the defendants, dismissing plaintiff-appellant’s case. In this medical malpractice action, Mrs. Long appeals a judgment rejecting her demands for damages for the alleged failure of physicians to perform medical tests and to adequately provide surgical and post-operative management of Mr. Long in conformity with the applicable standards of care. We affirm.
On November 19, 1973, Mr. Long sought treatment at the emergency room of West Jefferson General Hospital after experiencing symptoms of vomiting, diarrhea, and passing out over a two week period. He was seen and treated by Dr. Ribando who subsequently referred him to Dr. Michael D. Friley, a general surgeon. Dr. Friley first examined him on November 20, 1973. Following his examination, Dr. Friley consulted with Dr. J. Cranmer, a urologist; Dr. Deutsch, a urologist, and Dr. Robert G. Font, an internist. Dr. Friley diagnosed Mr. Long as having a probable duodenal ulcer and a stomach obstruction which necessitated surgery. Surgery was performed by Dr. Friley and his assistant, Dr. E. Ward Sudderth on November 27, 1973. Following surgery, Mr. Long developed complications and subsequently died on December 2, 1973. Post-surgical treatment and management consisted primarily of treatment for pancreatitis; however, the autopsy report prepared by Dr. Louis H. Stern, pathologist, lists the immediate cause of death as extensive and severe peritonitis.
Plaintiff-appellant now brings this appeal asserting as error the following specifications:
1. The trial court erred in deciding this case solely upon the determination that “a wrong diagnosis is not negligence nor malpractice;”
2. The trial court erred in failing to consider whether the defendants’ conduct breached the applicable standard of care in failing to perform clearly indicated and necessary medical tests, and
3. The trial court was manifestly erroneous in determining as a matter of fact that the surgical and post-operative management of the patient was adequate and in conformity with the applicable standards of care.
At trial the medical evidence consisted primarily of Mr. Long’s hospital records during the time of his treatment at West Jefferson General Hospital from November 19,1973 to December 2, 1973 when he died, the autopsy report by the pathologist, and several drawings and diagrams illustrative of the anatomy involved and the surgery performed on Mr. Long. The medical testimony consisted of three expert witnesses who testified on behalf of Mrs. Long and two expert witnesses who testified on behalf of the doctors. The defendants-appel-lees, Dr. Michael D. Friley, a general surgeon, Dr. E. Ward Sudderth, a general surgeon and Dr. Robert G. Font, a specialist in gastroenterology and internal medicine also testified. Further testimony was taken from R. Russell Raneri, a former employer of the decedent; Ellis Gusler, Mrs. Long’s sister; Audrey Ray, a customer of the decedent and his wife; Dr. Melville Wolfson, an expert in the field of economics, and plaintiff-appellant, Mrs. Vivian Long.
The first contention urged by appellant is that the trial judge misapplied the law by only considering the issue of whether there was malpractice or negligence per se and by failing to determine whether the doctors *734 were negligent. Appellant claims that the trial judge’s legal analysis is deficient in that it only dealt with the legal principle that a medical misdiagnosis is not malpractice or negligence per se. See, e.g. Forstall v. Hotel Dieu Hospital, 429 So.2d 213 (La.App. 4th Cir.1983), writ denied 433 So.2d 1054 (La.1983) and Gendusa v. St. Paul Fire & Marine Insurance Company, 435 So.2d 479 (La. 4th Cir.1983), writ denied 441 So.2d 748 (La.1983), writ denied on behalf of Gendusa v. St. Paul Fire & Marine Insurance Company, 441 So.2d 749 (1983).
In Borne v. Brumfield, 363 So.2d 79 (La.App. 4th Cir.1978) the fourth circuit emphasized the need to find negligence in a case involving misdiagnosis when it held that:
“... Malpractice exists in a case of misdiagnosis only if it results from the failure of the physician to exercise the standard of care prevailing for members of the same profession under similar circumstances. Id. at 484.”
Appellant cites McCoy v. Franklin Parish Police Jury, 414 So.2d 1369 (La.App. 2nd Cir.1982) for the proposition that whenever the trial court’s finding is reached by overlooking the applicable legal standards, the appellate court is not required to accept the trial court’s findings of fact. However, we find that the trial judge did not overlook the correct legal principles for concluding that the defendants were free of negligence. Moreover, there exists a presumption that the trial judge arrived at the proper interpretation of the law. Schmidt v. Travelers Insurance Company, 259 So.2d 632 (La.App. 4th Cir.1972).
The trial judge correctly cited the law which controls in this matter. He quoted LSA-R.S. 9:2794(A), Sections (1), (2) and (3) which provide that:
A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., or a dentist licensed under R.S. 37:751 et seq., the plaintiff shall have the burden of proving:
(1)The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians or dentists licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians or dentists within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill, and
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
The alleged incidents of malpractice occurred in 1973. L.S.A.-R.S. 9:2794 was enacted in 1975. In Ardoin v. Hartford Accident & Indemnity Co., 360 So.2d 1331 (La.1978) the Louisiana Supreme Court held that the statute should be given retrospective effect and applied to facts which occurred prior to its adoption. Similarly, we apply the statute to the instant case as did the learned trial judge. Additionally, the court in Ardoin held that:
“... a medical specialist is required by La.Civil Code Articles 2315 and 2316, and La.R.S. 9:2794, to exercise the degree of care and possess the degree of knowledge or skill ordinarily exercised and possessed by physicians within his medical specialty. ... Id. at 1340.”
Looking at the standard of care, the trial judge found that the defendants were not negligent. We believe that the trial judge was well aware of the applicable standard of care since he took pains to cite the relevant portions of the statute. In addition, at no point in his reasons does he state that he only considered misdiagnosis as the sole factor in determining that the doctors were free of negligence. Instead, *735 he was considering negligence and not just negligence per se as is evident from the discussion of the following specifications of error. Accordingly, we find appellant’s first contention to be without merit. ':
Related to appellant’s first argument is her second claim that the trial judge did not consider whether the doctors were negligent in failing to perform what appellant contends are clearly indicated and routine medical tests. In determining whether the doctors failed to exercise reasonable postoperative care and management, the trial court is guided by the opinions of qualified expert witnesses. See, e.g. Gendusa, supra and Guillory v. Buller, 398 So.2d 43 (La.App. 3rd Cir.1981).
Appellant contends that the doctors should have ordered further tests. She stresses that tests such as blood, wound and drain cultures as well as gram stains are routine. She further claims that Mr. Long’s symptoms were clearly suggestive of peritonitis, thus necessitating the need for these tests. Dr. Friley testified that although he considered the diagnosis of peritonitis prior to Mr. Long’s death on December 2, 1973, he did not consider it to be likely after considering the total clinical picture. Additionally, Dr. Friley testified that Mr. Long was expected to develop pancreatitis; however, he also testified that while pancreatitis can cause a chemical peritonitis, which is a chemical irritation of the peritoneal cavity, this does not necessarily result in a bacterial peritonitis. Furthermore, he stated that there were no indications of such an infection present during his treatment of Mr. Long. In particular, he observed no pus and no signs of poor healing of the surgical wound. Additionally, he noted that Mr. Long’s white blood count was going down.
Pancreatitis occurs when the pancreas releases tremendous amounts of enzymes known as amylase. Appellant argues that these enzymes set the stage for a bacterial infection known as peritonitis. Mr. Long’s autopsy report revealed the immediate cause of death to be peritonitis. Appellant contends that in view of the alleged expectation of peritonitis coupled with the clinical signs observed in Mr. Long that the defendants were negligent in failing to order tests to manage and to treat peritonitis.
The trial judge heard extensive and conflicting testimony with regard to these issues. Mrs. Long’s expert witnesses were Dr. Phillip E. Lear and Dr. David Wyatt Aiken, both general surgeons, and Dr. William Mogabgab, a specialist in internal medicine and medical microbiology. The experts who testified on behalf of the doctors were Dr. Francis C. Nance and Dr. Michael James McAlvanah, both general surgeons.
Mrs. Long’s experts testified that pan-creatitis set up the likelihood for a bacterial infection. Dr. Mogabgab testified that since pancreatitis provided a breeding place for bacterial growth the standard of care required cultures. However, the doctors’ expert, Dr. Nance specifically testified that he did not think that pancreatitis set up the likelihood for growing bacteria.
Appellant also argues that Mr. Long’s temperature, respiration and pulse chart indicates infection. While Drs. Lear, Aiken and Mogabgab testified that Mr. Long’s clinical picture indicated peritonitis and thus the need for medical tests to determine the appropriate treatment, the doctors’ experts found the variation in these vital signs to be consistent with pneumonia and pancreatitis. They further found that the treatment was reasonable in light of the clinical picture presented by Mr. Long. Moreover, Dr. Nance testified that the “blind” culturing of fluids in response to a temperature is of little value in the management of a patient.
Appellant further contends that Mr. Long’s white blood count should have alerted Dr. Friley to the presence of an infection. Again, there was conflicting testimony with regard to the interpretation of the white blood count. Mrs. Long’s experts attached greater significance to the number of immature cells found in the analysis while the doctors’ experts considered the white blood count of the mature cells to be of greater importance. Therefore, when *736 the total number of mature white blood cells was lowered, the doctors’ experts believed that the defendant-doctors were justified in finding that Mr. Long's condition was improving.
Dr. Mogabgab testified that if cultures had been done of every fluid draining from the body, then bacteria would have grown for the defendant doctors to treat. In contrast, Dr. Nance testified that if a culture had been taken of the drain from which the amylase was secreting there would have been bacterial growth in any event, simply from contamination with the skin.
Dr. Nance also testified that he saw no evidence in the chart on the first or second post-operative day that a blood culture was necessary. Dr. Nance further indicated that as of the third post-operative day he did not know whether he would have done a blood culture since he would have had to have seen Mr. Long in order to make that determination. He also stated, however, that cultures of the blood would not be a definitive indication whether there was a bacterial infection in the peritoneal cavity. Furthermore, he testified that when Dr. Sudderth examined Mr. Long on December 1, 1973, the day before Mr. Long died, Dr. Sudderth was justified in feeling that Mr. Long was getting better from the pancreat-itis in light of the total clinical picture. Interestingly, while Dr. Lear believed that Mr. Long’s drop in temperature which was noted on December 1, 1973 indicated that he ws going to die, both Drs. Nance and McAlvanah viewed the lowering in temperature as an improvement.
There was also conflicting testimony with regard to the significance of Mr. Long’s hard, distended abdomen. Dr. Aiken testified that the hard, distended abdomen noted on November 29,1973 is consistent with a severe infection. However, he did admit that pancreatitis may also result in a distended abdomen. Dr. Mogabgab also testified that the abdominal distention probably could have resulted from pneumonia, pancreatitis and surgery and not necessarily be associated with a bacterial infection. Similarly, Dr. Nance testified that the distension is a clinical finding of pan-creatitis. Moreover, Dr. McAlvanah attributed the hard, distended abdomen to the inflammatory response of the operation, the pancreas and subsequent pulmonary problems.
Mrs. Audrey Ray testified that when she visited Mr. Long before he died she noted an awful odor. Dr. Friley, however, testified that he did not smell any unusual odors. Additionally, Dr. McAlvanah testified that if a lay person noted a foul odor the odor could possibly come from several sources, one of which could be a bowel movement. Thus, the testimony is conflicting with regard to whether Mr. Long had a foul odor suggestive of an infection.
In viewing the care provided by the doctors, both Dr. Nance and Dr. McAlvanah found that the treatment was reasonable in light of Mr. Long’s clinical symptoms. Dr. Nance specifically testified that Dr. Sud-derth and Dr. Friley did not ignore an obvious complication.
Dr. McAlvanah further testified that the post-operative treatment met the acceptable standard of care. He also agreed with Dr. Nance that given the clinical picture presented by Mr. Long on December 1, 1973, the day before he died, that Dr. Sud-derth was justified in feeling that Mr. Long was improving. Dr. McAlvanah felt it was extremely important that Mr. Long’s mature white blood count had reached a normal level.
On the other hand, Mrs. Long’s experts, Drs. Lear, Aiken and Mogabgab testified that there were violations of the 1973 standards of medical care. In particular, they testified that cultures of the blood and wound or of fluids coming out of the patient’s body should have been ordered. However, Dr. Aiken’s testimony is conflicting with regard to blood cultures. He also testified that it was not routine to culture blood.
Although the trial judge did not give detailed reasons for judgment, he obviously considered the evidence and testimony pertaining to the clinical picture presented by Mr. Long prior to his death when he re *737 ferred to “the then existing condition of Mr. Long.” He noted such factors as “serious pancreatitis with extremely high ama-lyse (sic), “pneumonia”, “having been , a long term heavy smoker”, and “the possibility of delirium tremens.” Thus, the trial judge gave an illustrative list of the myriad of symptoms observed.
Additionally, the trial judge found as a matter of fact that Mr. Long possibly suffered from “delirium tremens”. Mrs. Long’s experts believed that the confusión and irrational periods noted in the record were clearly the result of peritonitis, thus suggesting the need for further tests. However, Dr. Friley attributed the episodes of confusion to delirium tremens rather than as a sign of serious peritonitis. The trial judge obviously was impressed by Dr. Friley’s testimony.
Furthermore, the trial judge was mindful of the conflicting opinions when he stated that these differences were due to “the subsequent knowledge available to expert witnesses in the calm of their offices” in the form of the autopsy report which was “obviously not available to the defendant doctors.”
After considering the evidence and testimony related to Mr. Long’s medical condition, the trial judge concluded that the defendant doctors’ “judgment was not negligent.”
We have previously considered the problem where there are differing medical opinions Cross v. Hingle, 475 So.2d 1384 (La.App. 5th Cir.1985) and have relied on the standard of appellate review delineated in Canter v. Koehring Company, 283 So.2d 716 (La.1973) and its progeny.
In Canter, supra, the Louisiana Supreme Court held that:
[w]hen there is evidence before the trier of fact which upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court’s finding, on review the appellate court should not disturb this factual finding in the absence of manifest error ... the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluation and inferences are as reasonable. The reasons for this well-settled principle of review is based not only upon the trial court’s better capacity to evaluate live witnesses (as compared with the appellate court’s access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts. [Citations omitted] Id. at 724. See also Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Perniciaro v. Brinch, 384 So.2d 392 (La.1980); Davis v. Owen, 368 So.2d 1052 (La.1979).
The trial judge had ample testimony upon which to base his conclusion that the doctors were not negligent. Considering the trial court’s reasons and the entire record which we are able to view See, e.g. White v. C.F. Industries, Inc., 411 So.2d 511, (La.App. 1st Cir.1982), writ denied 413 So.2d 509 (La.1982); Southern Bell Telephone and Telegraph Co. v. Roy Cook & Sons, Inc., 218 So.2d 404 (La.App. 2nd Cir. 1969) we find no fault with the trial court’s conclusion that the doctors were not negligent.
With regard to appellant’s third contention that the trial court was manifestly erroneous, we disagree for the reasons previously discussed. Looking at the reasons and the record we find no manifest error in his conclusions.
Accordingly, for the reasons set forth the judgment dismissing appellant’s claims is hereby affirmed. Appellant is to pay costs.
AFFIRMED.